UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

ROCHE DIAGNOSTICS CORPORATION, )
                                    )
                Plaintiff,          )
                                    )
        vs.                         )          1:10-cv-1718-SEB-DML
                                    )
MEDICAL AUTOMATION SYSTEMS,          )
INC., GREGORY A. MENKE, and KURT    )
M. WASSENAAR,                       )
                                    )
                Defendants.          )

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION**

This cause is before the Court on Plaintiff's Motion for Preliminary Injunction

[Docket No. 9], filed on December 28, 2010.  Plaintiff, Roche Diagnostics Corporation

("Roche"), seeks a preliminary injunction that would maintain the status quo pending

arbitration of its substantive claims, to wit, that it fully and appropriately exercised its

contractually binding right of first refusal to purchase Defendant Medical Automation

Systems ("MAS") with which right of first refusal MAS and the individual Defendants,

Kurt M. Wassenaar and Gregory A. Menke,[1] failed to comply or otherwise honor.

On January 11, 2011, prior to any hearing or ruling by the Court on the instant

---

[1] The individual defendants are the co-founders and the majority shareholders of MAS.
Kurt Wassenaar acted as Executive Vice President and Chief Technology Officer for MAS until
October 2010, when he took over as CEO.  Gregory Menke was the acting CEO of MAS before
that date.  Both Mr. Wassenaar and Mr. Menke serve on the board of directors.

motion, Plaintiff filed a motion for a temporary restraining order ("TRO"), requesting immediate injunctive relief to prevent any of the Defendants from proceeding with the closing on a proposed merger of MAS with a third party by the name of Alere, Inc. ("Alere") prior to the Court's consideration of the instant motion. A hearing on Plaintiff's motion for a temporary restraining order occurred on January 19, 2011, and, following that hearing, on January 28, 2011, the Court entered a TRO prohibiting Defendants from closing on their proposed merger with Alere for fourteen days. On February 14, 2011, the Court extended the TRO through the date of the hearing, February 17, 2011.

A hearing on the instant motion was held on February 17 and 18, 2011. On the first day of the hearing, the Court again extended the TRO through and including the date of the issuance of this ruling. Having considered the briefing, documentary and testimonial evidence, controlling legal authorities, and oral argument, and acting in accordance with the need for an expedited ruling, the Court hereby <u>GRANTS IN PART</u> and <u>DENIES IN PART</u> Plaintiff's motion for preliminary injunction.

### **Factual Background**

Roche is an Indiana-based company active in the pharmaceutical and diagnostic fields. One segment of Roche's business is the sale to healthcare institutions of portable point-of-care devices for blood glucose testing and monitoring. In the mid-1990s, Roche partnered with MAS, a software provider, who developed the Remote Automated Laboratory Systems ("RALS") software product line, which acts synchronistically with

the blood glucose monitors sold by Roche.  MAS typically grants Roche authority to enter into license agreements with healthcare institutions who are Roche customers and the healthcare institutions then execute license agreements with MAS for the RALS software, and Roche pays MAS for those licenses.  The RALS software allows the data collected by the blood glucose monitor to be electronically transferred from the monitor to the healthcare institution's information system.  In addition to delivering patient information, the RALS software also configures the blood glucose monitors, performs certain analysis on the patient data, and verifies operator certification on the point-of-care devices.  These interlinkages between Roche's and MAS's product lines make them highly dependent on each other's success in the marketplace.

**The Co-Marketing Agreement**

In 2006, MAS and Roche restructured and reorganized their commercial relationship by executing a number of documents, including a Co-Marketing and Distribution Agreement ("the Co-Marketing Agreement").  The Co-Marketing Agreement, effective January 1, 2006, grants Roche the right to market, sell distribute and/or offer MAS's RALS software line, including the products known as RALS-Plus, RALS-Lite, RALS-Notebook, Next Generation RALS-Plus, and RALS Glucose Module, including any future versions or enhancements or improvements thereto.  The Co-Marketing Agreement grants Roche exclusive rights with respect to only one aspect of the RALS platform, that is, the RALS Glucose Model, including RALS-Lite and RALS-Notebook.

The initial term of the Co-Marketing Agreement ran from January 1, 2006 until December 31, 2010, when it expired. The Co-Marketing Agreement provided for automatic renewal periods unless either party gave notice of non-renewal. In the event of non-renewal, the Co-Marketing Agreement provided that it "shall continue from and after the end of the Initial Term, the Renewal Term, or the date of the Early Termination Notice (as applicable) for a 2-year wind-down period (the '**Wind Down Term**')." Co-Marketing Agreement § 6.3 (emphasis in original). The Co-Marketing Agreement further provided that "[d]uring the Wind Down Term, the parties' respective rights and obligations under this Agreement shall continue in full force and effect, except as and to the extent specifically modified pursuant to Section 6.4 or Section 6.5 (as applicable)." Id. The only modification relevant to this litigation is that, upon expiration resulting from non-renewal, Roche's exclusive rights as to the RALS Glucose Module, as set forth in Section 2.1 of the Co-Marketing Agreement, converted to non-exclusive rights.

Article 11 of the Co-Marketing Agreement addresses the protection of the parties' confidential information and trade secrets. Specifically, Section 11.1 of the Co-Marketing Agreement provides in relevant part that:

> Both MAS and Roche shall retain in confidence all Confidential Information received from the other prior to or during the term of this Agreement and will not, at any time during the term of this Agreement or after termination hereof, in any fashion, form or manner, either directly or indirectly, copy, reproduce, sell, assign, license, market, transfer, give, or otherwise disclose, divulge, release, or use for any purpose (other than in furtherance of the respective obligations and covenants contained in this Agreement) any Confidential Information received from the other party or an Affiliate of the other party. ... Each party furthermore agrees to not use

any Confidential Information disclosed by the other party or generated
hereunder for any purpose other than the activities agreed to be performed
by the parties hereunder, and to restrict access to such of its employees as
are entrusted to carry out such activities.

Co-Marketing Agreement § 11.1. Section 11.2 of the Agreement provides:

Each party agrees not to make any copies in whole or in part of Confidential
Information of the other party for any purpose other than the purposes set
forth and agreed to be the parties hereunder, and will, at the termination of
this Agreement, upon request by the disclosing party, return all Confidential
Information received from the disclosing party, including any copies
thereof, except that the receiving party may retain one (1) copy of each item
of Confidential Information in its legal department (or with its outside legal
counsel in the case of MAS) for use only in monitoring its compliance with
obligations here undertaken.

Co-Marketing Agreement § 11.2. Section 14.2 of the Co-Marketing agreement states that

the rights and obligations of the parties pursuant to Article 11 "survive any termination of

this Agreement, and shall bind the parties and legal representatives, and successors."

Section 13.2 of the Co-Marketing Agreement allows Roche the right to preempt

the sale of MAS to a Roche "Competitor," if Roche succeeds in matching the

competitor's offer to purchase MAS. The right of first refusal provision in Section 13.2

of the Co-Marketing Agreement provides as follows:

MAS and the Controlling Shareholders hereby grant to Roche during the
term of this Agreement a right of first refusal with respect to, and the right
to match any offers that MAS and/or either of the Controlling Shareholders
may receive involving, (a) the sale or transfer of all or substantially all of
MAS's assets to a Competitor, or (b) the issuance, sale, or transfer of capital
stock of MAS (or securities convertible into capital stock of MAS) that
would result (directly or upon the conversion of any securities convertible
into capital stock of MAS) in a Competitor owning a Controlling Interest
(as defined below) of MAS. MAS and the Controlling Shareholders agree
to notify Roche promptly in writing as to any pending offer from a

Competitor to acquire all or substantially all of MAS's assets, or a Controlling Interest of MAS (or securities convertible into capital stock of MAS the conversion of which would result in a Competitor owning a [C]ontrolling Interest of MAS). Roche shall have sixty (60) days from the date on which it receives written notice from MAS to evaluate and respond with respect to any such offer. In the event that Roche chooses to exercise the right to match granted herein, it shall notify MAS in writing to that effect on or before the end of the sixty-day evaluation period. Roche's notice of the exercise of its right to match shall match both the price and terms of the pending offer, and MAS and/or the Controlling Shareholders (as applicable) shall accept such Roche offer. In the event that Roche declines to exercise its right to match, MAS shall be free to accept the pending offer. Notwithstanding any other provision of this Agreement, no transfer or issuance of shares of MAS's capital stock may be made by MAS or a Controlling Shareholder, unless the person or persons to whom such shares are issued or transferred has agreed in writing to be bound to restrictions on the transferability of such shares of MAS capital stock that are consistent with the terms and conditions of, and the rights granted to Roche in, this Section 13.2, as if such person or persons were a Controlling Shareholder. For purposes of this Agreement, the term "**Controlling Interest**" shall mean either (a) ownership of more than fifty percent (50%) of the outstanding stock of MAS or (b) the power or authority to elect or appoint a majority of MAS's board of directors.

Co-Marketing Agreement, § 13.2 (emphasis in original).

**The Asset Purchase Agreement**

In early 2008, in order to avoid the effect of the December 31, 2010 expiration of its exclusive right to the RALS software under the Co-Marketing Agreement, Roche began negotiating to purchase MAS and/or the RALS technology. On October 12, 2010, the negotiations culminated in the signing of an Asset Purchase Agreement ("APA"), pursuant to which a newly-created Roche-owned entity named "Roche RALS" agreed to purchase MAS's RALS assets for $38 million, subject to a vote by the MAS shareholders. Pursuant to that agreement, Roche also agreed to forgive MAS's remaining debt to Roche

of approximately $1.9 million.  Closing on the purchase was to occur before November 30, 2010.

Section 4.1(b) of the APA sets out what the parties refer to as a "no shop provision," which provides as follows:

> After the date hereof and prior to the Closing Date or earlier termination of this Agreement, neither Seller nor the Key Shareholders shall initiate, solicit or negotiate or provide any information to facilitate, and Seller and the Key Shareholders shall cause any officer, director or employee of Seller, any attorney, accountant, investment banker, financial advisor or other agent retained by any of them or any of their Affiliates, not to initiate, solicit or negotiate or provide any information to facilitate, any proposal or offer to acquire all or any substantial part of the business, properties or capital stock of Seller, whether by merger, purchase of assets, tender offer or otherwise (regardless of form thereof), whether for cash, securities or any other consideration or combination thereof (any such transactions being referred to herein as an **"Acquisition Transaction"**).  Seller or the Key Shareholders (as applicable) shall promptly notify Buyer after receipt of any proposal from any Person to enter into an Acquisition Transaction, or request for access to the properties, Books and Records of Seller from any Person or group of Persons that is considering making, or has made, a proposal to enter into an Acquisition Transaction.  Such notice to Buyer shall be made orally and in writing and shall indicate in reasonable detail the identity of the offeror or potential offeror and the material terms and conditions of such proposal, inquiry or contact to the extent known.  Notwithstanding the foregoing, employees holding options to purchase common stock of Seller shall be permitted to exercise such options, and Seller shall be permitted to loan any or all of such employees some or all of the exercise prices payable upon exercise of such options.

APA § 4.1(b) (emphasis in original).  This "no shop" provision was viewed generally by the parties to be broader than the right of first refusal in Section 13.2 of the Co-Marketing Agreement.

**MAS's Notification to Roche of Alere's Interest**

From 2008 through the summer of 2010, in addition to engaging in negotiations with Roche, MAS was involved in preliminary discussions regarding the company's acquisition by various other entities. One of these entities was Alere, Inc. ("Alere"), a company also operating in the diagnostic and health management fields. The evidence adduced at the hearing establishes that MAS had an initial discussion with Alere in February or March of 2010 regarding Alere's expressed potential interest in acquiring MAS. On September 23, 2010, after being contacted by Alere, MAS again had discussions with Sanjay Malkani, an Alere employee who had previously been employed by Roche, regarding Alere's continued interest in buying MAS. Following that conversation, on September 29, 2010, Alere wrote MAS a letter expressing interest in "formally and directly engag[ing] with MAS to explore the potential acquisition of MAS by Alere or one of its affiliates." Exh. 18. Alere did not include a proposed purchase price in that letter. On October 1, 2010, MAS's board and its attorney engaged in a telephone conversation with Alere's CEO, Ron Zwanziger, regarding Alere's expressed interest in purchasing MAS. During that conversation, MAS informed Mr. Zwanziger that it was in final discussions and negotiations in furtherance of a deal with Roche for the acquisition of MAS.

Not to be discouraged, on October 5, 2010, Alere sent another letter of interest to MAS. Exh. 19. This letter did not include a proposed or possible purchase price, but included the following acquisition formula: the purchase of the stock for a multiple of ten

times MAS's EBITDA, with 10% of the purchase to be held in escrow. The exact form of the proposed transaction was to be determined following Alere's due diligence. In response, MAS thanked Alere for its interest, but did not engage in substantive discussions. The next day, on October 6, 2010, Alere sent yet another letter indicating its continuing interest in acquiring MAS. In that letter, Alere proposed to purchase MAS's stock for $38.5 million, with 10% of the amount held in escrow to cover contingent liabilities that might be identified after due diligence subject to a defined working capital adjustment. See Exh. 22. The cash to closing figure proposed in the October 6 letter appeared, on its face, to be considerably in excess of the price of the APA proposed by Roche. On that same date, Defendant Kurt Wassenaar, MAS's CEO, emailed Mr. Zwanziger and other Alere executives, stating, "I want to acknowledge our receipt of your letter of interest in acquiring MAS and our enthusiasm with your interest in exploring these potentials further. ... We [MAS board of directors] understand and share the desire to move our discussions forward as quickly as possible within the confines of some other current limitations." Exh. 48.

On October 8, 2010, MAS's board met to discuss whether to approve the APA and what effect Alere's expressions of interest in the acquisition of MAS might have on that decision. Mr. Wassenaar testified that the board ultimately decided that Alere's expression of interest was at that point too undefined for MAS to pursue negotiations and perhaps risk losing the APA, which Wassenaar described as "a bird in the hand." Thus, as of the October 8 board meeting, MAS both supported and approved the APA. On

October 12, 2010, MAS and Roche officially executed that agreement.

On October 13, 2010, Alere again communicated with MAS by letter, stating, "We are disappointed that to date we have not received a response from the Board on our previous offers to acquire MAS. We would like to have a conference call tomorrow morning to discuss what we need to do to make the offer more attractive and to move forward with a transaction." Exh. 35. MAS did not respond to this letter and did not schedule the conference call Alere had requested. On October 14, 2010, MAS informed Alere via letter that MAS had decided not to pursue discussions with Alere. Not willing to take no as an answer, Mr. Zwanziger responded by email on October 15, 2010, reiterating that Alere "remain[ed] willing to close a transaction to acquire MAS expeditiously and at a higher price than [MAS's] current alternative." Exh. 38.

On October 21, 2010, nine days after Roche RALS and MAS signed the APA, MAS notified Roche RALS by letter that it had received an expression of interest from Alere regarding a possible purchase of MAS. In the October 21 letter, MAS notified Roche that in communicating to Roche this "expression of interest" it was acting pursuant to Section 4.1(b) of the APA. Exh. 3. No mention was made in MAS's October 21 letter of the ROFR provision contained in Section 13.2 of the Co-Marketing Agreement.

The next day, on October 22, 2010, Alere advanced its intentions in yet another letter sent to MAS. Alere set forth a proposed $40 million purchase price, subject to a defined working capital adjustment and subject to 10% of the purchase price being held in escrow to cover contingent liabilities discovered in due diligence. Alere further stated

that its letter "is intended to reflect our indication of interest only and ... is not intended to be a binding offer." Exh. 4 at 1.  However, the letter also provided: "From the information available to us, we believe our offer stated in this indication of interest is far superior to the transaction contemplated with Roche on an after tax basis, and should be presented as an alternative to your stockholders." Id.  Alere continued, stating that it "expect[s] the parties to execute and deliver definitive documentation within 10 days after the date that this letter is countersigned by MAS and to close simultaneously or as soon as possible thereafter in accordance with applicable law and legal requirements." Id. at 3. The letter closed with the following: "If the foregoing meets with your approval, please indicate your agreement by countersigning this letter in the space provided below and delivering the countersigned letter to Alere at your earliest convenience." Id. at 5.  MAS did not countersign or return the letter to Alere.

On that same day, MAS sent a letter to Roche describing Alere's October 22 letter, again referencing Section 4.1(b) of the APA.  It did not, however, provide Roche with a copy of Alere's letter.  A few days letter, in a letter dated October 25, 2010, Steve Oldham, Roche's Vice President, Law and Ethics Compliance, General Counsel and Secretary, responded to the October 22 letter from MAS as follows:

> We are in receipt of letters from Medical Automation Systems, Inc. ("MAS") dated October 21, 2010 and October 22, 2010, each delivered by MAS pursuant to Section 4.1(b) of the above-referenced Purchase Agreement, notifying Roche RALS, Inc. ("Roche") that MAS has received and continues to receive from Alere, Inc. ("Alere") communications describing Alere's purported interest in acquiring MAS.

While acknowledging receipt of the letters, we wish to remind MAS and the Key Shareholders (as defined in the Purchase Agreement) of their covenants and agreements in Section 4.1(b) of the Purchase Agreement that prohibit both MAS and the Key Shareholders from "initiat[ing], solicit[ing] or negotiat[ing] or provid[ing] any information to facilitate ... any proposal or offer to acquire all or any substantial part of the business, properties, or capital stock of [MAS]." Furthermore, we note that MAS and the Key Shareholders are subject to confidentiality obligations under both the Confidentiality Agreement dated as of October 11, 2007 (as amended on November 11, 2009) and Section 4.4(b) of the Purchase Agreement that prohibit MAS and the Key Shareholders from disclosing, among other things, confidential information about MAS and the transactions contemplated by the Purchase Agreement.

We trust that MAS and the Key Shareholders have complied with the covenants described above and will continue to comply with these obligations, together with all of the other obligations of the Key Shareholders and MAS in the Purchase Agreement to bring about the timely consummation of the transactions contemplated by the Purchase Agreement.

Appendix, Exh. F. Roche did not request a copy of Alere's October 22 letter or any additional information regarding Alere's interest.

On October 27, 2010, ever the ardent and persistent suitor, Alere sent another letter to MAS "to further elaborate [its] position regarding [its] intent to acquire MAS." Exh. 28. This letter was not discussed by MAS's board, and MAS did not provide notice of it to Roche, which withholding, according to Mr. Wassenaar, was due to the fact that the information contained within the letter was merely duplicative of the information MAS had already provided to Roche. MAS received another letter from Alere on October 30, 2010, in which Alere again expressed its interest in purchasing MAS and providing "additional points in [its] consideration of [Alere's] proposed acquisition of MAS

pursuant to the terms of the [October 22] Indication of Interest." Exh. 33. MAS's board conducted informal discussions about this letter, but took no action with respect to it and again did not inform Roche of its receipt.

**MAS Shareholder Vote on the APA**

On November 11, 2010, MAS sent a consent solicitation statement to its shareholders in advance of the vote on the APA. A reference to Alere's interest in acquiring MAS was included in that statement. The consent solicitation summarized Alere's letters of October 5, October 6, October 22, and October 30, and described Alere's interest as "the Current Offer." Exh. 42 at 6. The consent solicitation also contained a section comparing the projected financial consequences of the APA with Alere's Current Offer. In the cover letter accompanying the consent solicitation, Mr. Wassenaar, MAS's CEO, stated that Alere's proposal "on its face, appears to exceed the amounts offered to be paid by Roche RALS for the RALS-related assets."

The shareholder tally attracted approximately eighty-five percent of the outstanding shares of MAS as being against the APA, including the shares of Mr. Wassenaar and Mr. Menke.[2] MAS notified Roche of the outcome of the vote by letter dated November 22, 2010. On November 30, 2010, MAS notified Roche of its decision to terminate the APA in accordance with Section 6.1(e), which provision stated that, if the

---

[2] As "key shareholders" defined by the APA, Mr. Wassenaar and Mr. Menke both signed certain sections of the APA (dealing with confidentiality, etc.) in their individual capacities, but there was no requirement in the APA that they subsequently vote in favor of the agreement.

closing did not occur by that date, the APA could be terminated.[3]

**Negotiations with Alere Following Termination of the APA**

On December 1 or December 2, 2010, one or two days after termination of the APA, Mr. Wassenaar contacted Mr. Zwanziger of Alere to inform him that the Roche deal had been disapproved by MAS shareholders and that MAS was thus available to undertake discussions with Alere, if the company were still interested.  On December 3, 2010, Alere sent MAS an 85-page draft merger agreement, which Alere represented was intended for discussion purposes only and was not to be construed by MAS as an offer.[4]
See Exh. 58.  In that draft agreement, Alere proposed to pay MAS $40 million for its stock with a 10% escrow fund for certain liabilities; these were essentially the same financial terms that Alere had proposed in its October 22 letter.  MAS informed Alere that the draft agreement as a whole was unacceptable, but MAS's attorney marked up one section of the agreement (which did not alter the economic terms of the deal) and returned it to Alere's counsel on December 9, 2010.  MAS did not inform Roche of its receipt of the draft merger agreement.

On December 10, 2010, Alere's Chief Technical Officer along with Jim Post, an

---

[3] On December 28, 2010, Roche filed an action in the United States District Court of the Southern District of New York seeking specific performance with respect to the terminated APA.  That litigation continues and has not been included in any merits-based way in our decision here.

[4] Mr. Wassenaar testified by deposition that Alere had told MAS that it "had a misunderstanding about the Article 13.2 provisions under the Co-Marketing with relation to the right of first refusal and, therefore, didn't want to proceed to do anything which might inadvertently trigger that."  Wassenaar Dep. at 189.

Alere executive, visited MAS for a one-day information meeting focused on technical production-related matters, during which MAS gave Alere an explanation of its products. Due diligence between MAS and Alere continued throughout December, but, according to Mr. Wassenaar, MAS did not want to risk triggering Roche's right of first refusal before the Co-Marketing Agreement was due to expire,[5] so MAS and Alere agreed to postpone their discussions until sometime after December 31, 2010, which was the expiration date of the Co-Marketing Agreement.

**Roche Purports to Exercise its Right of First Refusal**

Following the termination of the APA, counsel for Roche and MAS continued to discuss possible ways in which the APA could be revived into a deal between the two parties. In light of the impending expiration date of the Co-Marketing Agreement, Roche's counsel sent to MAS on December 10, 2010 a draft amendment designed to extend both the initial term of the Co-Marketing Agreement and the deadline for the exercise of non-renewal rights to January 31, 2011. Roche's counsel also sent a draft of an "Interim Agreement," designed to prevent MAS from discussing any deal with other companies in order to give the parties additional time to conduct discussions regarding the modification of the APA. MAS declined to sign either of these proposed documents, however.

---

[5] Mr. Wassenaar testified that, in addition, MAS and Alere did not believe it to be possible to complete the deal before January with the impending holidays and the fact that MAS was at that time in the process of transitioning to new outside deal counsel.

On December 16, 2010, Roche's deal counsel, Kepton Carmichael, telephoned MAS's counsel, Michael Drzal, to learn MAS's response to Roche's proposed modifications to the APA. Mr. Drzal stated that MAS shareholders were no longer interested in Roche's proposed modifications or any variation of the APA because MAS wanted a deal in which the buyer purchased the shareholders' stock in MAS as opposed to MAS's assets.

On December 17, 2010, Roche met via conference call with a large group of its U.S. and Swiss-based executives as well as two attorneys from the Indianapolis law firm of Barnes & Thornburg. That evening, Roche, by letter from its President and CEO, Jack Phillips, informed MAS that it was "exercis[ing] its right of first refusal and hereby matches and offers to acquire MAS on the price and terms of the [Alere offer]." Exh. 7. In that letter, Roche for the first time characterized the October 22 Alere letter as a "pending offer from a 'Competitor'" under Section 13.2 of the Co-Marketing Agreement. According to Roche, on December 21, 2010, when it had not yet received confirmation from MAS regarding its December 17 offer, its counsel, Mr. Carmichael, telephoned Mr. Drzal, who, besides confirming receipt of the offer, did not otherwise substantively respond.

On that same day, Mr. Carmichael sent an e-mail to MAS's counsel, stating: "I was pleased to hear you confirm that Roche has exercised its right of first refusal through its offer to acquire MAS as described in Roche's December 17 letter and that MAS and the Controlling Shareholders have accepted Roche's offer." On December 22, 2010,

MAS's counsel sent Mr. Carmichael a correcting e-mail, stating, "We never discussed the letter from Roche Diagnostics Corporation dated December 17, 2010. ... No offer from Roche has been received to date ... a response to any offer from Roche, should an offer be forthcoming, will be in the form of a direct communication from MAS to Roche and not through email exchange between us."

On December 23, 2010, MAS sent a letter to Roche, thanking Roche for its interest and inviting Roche's continuing interest in a possible acquisition, but objecting to Roche's purported exercise of its right of first refusal rights under Section 13.2 of the Co-Marketing Agreement and advising Roche that it would entertain offers to acquire it from both Roche and Alere. Exh. 8. On that same date, under separate cover, MAS notified Roche of its intent not to renew the Co-Marketing Agreement.[6] Exh. 9. This notice was

---

[6] According to MAS, the principal reason it decided to send the December 23 notice of non-renewal was that for approximately two years Roche had been unable to bring its next generation of glucose meters (the Inform II meter) to market, in spite of Roche's promises to MAS and to the industry that its new meter would be forthcoming. Specifically, Mr. Wassenaar testified in his deposition as follows:

> The primary factor was the fact that Roche had failed over a two-year period to get its meter in the marketplace, and exclusivity was frankly getting ready to kill our business because our customers weren't able to have a viable meter solution from Roche, and because we are tied to them, we face losing a significant portion of our customer base. That was a bad, very bad outcome for us.

> We learned right about this same time [late December 2010] that the FDA had further rejected Roche's current application for approval by the FDA, and there were no immediately clear paths or plans for when it would be approved, if ever.

> It was a very hard decision to make, but we felt that unless we started the process of separating ourselves, that we were really going to be in a very, very bad position relative to our future viability as a business because of the Roche

(continued...)

accepted by Roche without objection.

On December 27, 2010, citing MAS's December 23 letter, Roche notified MAS and the individual defendants of a dispute under Section 13.2 of the Co-Marketing Agreement. Roche invoked Article 10 of the Co-Marketing Agreement, triggering the agreement's dispute resolution procedures which require the parties to proceed to arbitration as provided for under Section 10.3 of the Co-Marketing Agreement. Exh. 10. The next day, on December 28, 2010, Roche filed the instant action, requesting a preliminary injunction to maintain the status quo pending arbitration of its substantive claims, as agreed to in the parties' Co-Marketing Agreement.

**Offers from Roche and Alere Following Expiration of the Co-Marketing Agreement**

Following expiration of the Co-Marketing Agreement on December 31, 2010, both Roche and Alere continued to negotiate with MAS regarding the purchase of the company or its assets. On January 4, 2011, Roche sent MAS a non-binding offer letter outlining a transaction between the parties structured as a merger for $40 million (less debt and subject to certain upward or downward working capital adjustments), and subject to a $4 million holdback and execution of a definitive agreement of merger. The letter further indicated that Roche's counsel would prepare a draft acquisition agreement and requested counter-execution and return of the letter. Neither MAS nor any of its

---

[6](...continued)
problems.

Wassenaar Dep. at 204-205.

shareholders signed the letter and Roche never forwarded to MAS a draft acquisition agreement. Pursuant to the dispute resolution procedures contained in the Co-Marketing Agreement, MAS agreed to meet with Roche representatives on January 7, 2011. Although the parties discussed a framework and preliminary schedule for a possible stock acquisition during the all-day meeting on January 7, Roche never set a specific price for the possible deal at any point during the meeting.

Later that same evening, Alere indicated to MAS's CEO that it was prepared to make a new acquisition proposal. Between January 8 and January 11, 2011, MAS and Alere negotiated a $43 million, all cash deal. On January 10, 2011, MAS's board of directors convened a special meeting with its advisors at which time resolutions approving the Alere transaction were unanimously adopted, and, in the early morning hours of January 11, 2011, MAS and Alere executed the merger transaction documents. On January 13, 2011, MAS sent the consent solicitation to its shareholders and approximately eighty-three percent returned consents approving the transaction.

**The Instant Litigation**

On January 11, 2011, Roche filed a motion seeking a temporary restraining order to prevent any of the MAS Defendants from closing on the proposed transaction with Alere before the Court heard and ruled on the instant motion. On January 28, 2011, the Court entered a TRO as requested by Roche, which as previously noted has been extended through the date of the filing of this ruling.

## Legal Analysis

### I.    Standard of Review

A grant of injunctive relief is appropriate if the moving party is able to demonstrate: (1) a reasonable likelihood of succeeding on the merits; (2) irreparable harm if preliminary relief is denied; and (3) an inadequate remedy at law.  <u>Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of America, Inc.</u>, 549 F.3d 1079, 1086 (7th Cir. 2008).  The situation presented in this action is somewhat unique in that the merits of Roche's right of first refusal claim are not before this Court, but will instead ultimately be decided in arbitration.  Because Roche seeks a preliminary injunction in aid of arbitration, our inquiry regarding the likelihood of success on the merits centers on whether Roche has shown an ability to establish the existence of a meritorious issue for the arbitrator to decide.

If the moving party fails to demonstrate any one of the three threshold requirements, the emergency relief must be denied.  <u>Id.</u>  However, if these threshold conditions are met, the Court must then undertake to assess the balance of harm – the harm to Plaintiffs if the injunction is not issued against the harm to Defendant if it is issued – and, where appropriate, also determine what effect the granting or denying of the injunction would have on nonparties (the public interest).  <u>Id.</u>

In determining whether to grant injunctive relief, the district court must take into account all four of these factors and then "exercise its discretion 'to arrive at a decision based on the subjective evaluation of the import of the various factors and a personal,

intuitive sense about the nature of the case." Id. (quoting Lawson Products, Inc. v. Avnet, Inc., 782 F.2d 1429, 1436 (7th Cir. 1986)). This process involves engaging in what is often referred to as the "sliding scale" approach, meaning that "the more likely it is the plaintiff will succeed on the merits, the less balance of irreparable harms need weigh toward its side; the less likely it is the plaintiff will succeed, the more the balance need weigh towards its side." Abbott Laboratories v. Mead Johnson & Co., 971 F.2d 6, 12 (7th Cir. 1992). The sliding scale approach "is not mathematical in nature, rather 'it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief.'" Ty, Inc. v. Jones Group, Inc., 237 F.3d 891, 895-96 (7th Cir. 2001) (quoting Abbott Laboratories, 971 F.2d at 12).

## II. Discussion

### A. Likelihood of Success on the Merits

The facts properly summarized based on the evidence adduced at the hearing establish that, following MAS's termination of the APA on November 30, 2010, MAS and Roche continued their negotiations regarding possible modifications to the APA in an effort to make Roche's offer more favorable to the MAS shareholders. Believing that it was still possible to reach a deal with MAS pursuant to a modified version of the APA, Roche focused its efforts in early December on reviving the APA. It was not until December 16, 2010, when Mr. Carmichael on behalf of Roche was informed by Mr. Drzal on behalf of MAS that MAS was no longer interested in any further discussions

regarding modification of the APA that Roche shifted its focus from those efforts to enforcing its rights under Section 13.2 of the Co-Marketing Agreement. The next evening, on December 17, 2010, Roche notified MAS that it was invoking its right of first refusal in response to Alere's October 22 letter.

MAS contends that the fact that Roche never raised the issue of its right of first refusal before December 17 shows that its invocation of that right was merely "a contrivance." MAS contends that no offer by Alere was ever received or accepted during the effective time period of the Co-Marketing Agreement and thus nothing happened to trigger Roche's right of first refusal. However, Roche cites two qualifying events that it contends either one of which, properly construed, triggered its right of first refusal. Regardless of whether pegged to Alere's October 22 letter or to Alere's subsequent December 3 proposed merger agreement, it is clear that Roche's notice sent pursuant to Section 13.2 of the Co-Marketing Agreement was delivered to MAS within the required 60-day window, making it timely. Moreover, Roche's corporate counsel, Mr. Carmichael, testified that Roche was not focusing on its right of first refusal prior to the point in time when it asserted that right because, up until then, Roche believed it would succeed in modifying the APA with MAS, which would have rendered invocation of the right of first refusal unnecessary.

MAS also contends that Roche cannot properly claim that its right of first refusal was triggered by MAS's actions with Alere, because MAS had informed Roche that it was giving notice of Alere's October 22 letter pursuant to Section 4.1(b) of the APA only

and that MAS never referenced the Co-Marketing Agreement in any other notice it provided to Roche. However, if MAS had received an offer from Alere sufficient to create a duty on its part to have allowed Roche to exercise its rights under Section 13.2 of the Co-Marketing Agreement, MAS cannot evade its contractual obligations merely by giving Roche an inadequate or improper notification. The evidence adduced at the hearing establishes that there is a genuine dispute regarding whether Alere's expressions of interest – as set forth in either the October 22 letter or thereafter in the December 3 proposed merger agreement – were sufficiently definite to be considered "pending offers" under the Co-Marketing Agreement so as to trigger MAS's duty to notify Roche pursuant to Section 13.2. Thus, even though MAS's notice to Roche was limited to the APA, that does not, by itself, eviscerate Roche's rights under the Co-Marketing Agreement.

MAS next claims that Roche has failed to show a likelihood of success on the merits of its claim because, even if Alere did make an offer sufficiently structured to fall within Section 13.2, MAS never indicated that it intended to accept such an offer during the term of the Co-Marketing Agreement. However, there is considerable conflict in the evidence with respect to MAS's acceptance of Alere's offer. Roche has set forth a convincing argument that, although it is clear that MAS never expressly accepted either the October 22 or December 3 proposals from Alere, there is sufficient evidence from which it could be concluded that MAS constructively accepted a deal with Alere before the date of the expiration of the Co-Marketing Agreement, strategically choosing to avoid any express acceptance until after that agreement expired as a way to thwart Roche's

contractual rights.  The fact that, with just a few weeks left before expiration of the Co-Marketing Agreement, MAS and Alere completed their due diligence, agreed to put their negotiations "on ice" until January when the Co-Marketing Agreement expired, and then signed a deal in slightly more than a week in early January, could be sufficient to support a finding that everything leading up to the December 31, 2010 expiration date resulted in a constructive acceptance by MAS of Alere's proposal.  In that event, MAS had a duty to provide Roche with Section 13.2 notice during the period that the Co-Marketing Agreement was still in effect.  For these reasons, we find that Roche has met its burden to show a reasonable likelihood of success on the merits of the arbitration proceedings.

### B.    Inadequate Remedy at Law/Irreparable Harm

Roche has presented evidence establishing that, if a preliminary injunction does not issue, Roche will suffer various significant harms stemming both from the final closing of the proposed MAS/Alere merger as well as from the loss of its exclusive right to MAS's RALS Glucose Model software.  As discussed in our January 28, 2011 Order granting Roche's motion for a TRO, Roche has established that a final closing of the proposed MAS/Alere merger poses a threat of immediate harm to Roche.  If and when that deal closes, Alere, a competitor of Roche,[7] will have taken over control and operation of the new company that was previously MAS, and be free to make business decisions

---

[7] Extemplo, a subsidiary of Alere, is the entity that, pursuant to MAS and Alere's merger agreement, will merge with MAS.  The merger agreement provides that, when the merger closes, MAS's articles of incorporation, by-laws, and board of directors will be replaced by Extemplo's.

that could substantially impact the nature and extent of MAS's operations, both internally and in the marketplace, effectively changing the face of the company for which Roche contends it has a valid right of first refusal to purchase.

Part of the harm to Roche if the MAS-Alere closing is allowed to proceed relates to Alere's intentions to focus on the development of its Epical meter, which, although currently still a fledgling product, has the potential of becoming a competing product to Roche in the blood glucose point-of-care market. Even if Alere does not make substantial changes in the manner in which MAS has operated its business, as Roche fears, a closing would nevertheless likely cause irreparable damage and disruption to Roche's relationships with its customers who have come to rely on Roche's access to MAS's software for their businesses.

MAS has indicated that it intends in any event to abide by its contractual obligations as set forth in the Co-Marketing Agreement by continuing to provide Roche access to the software for a two-year wind down period, which could lessen the negative effect of the proposed closing on Roche's customer relationships, and in addition MAS/Alere has promised to maintain the confidentiality requirements. However, customer goodwill would likely still suffer damage because it would be clear that MAS/Alere's forbearance would be, at most, only a short-term matter, and Roche's continuing ability to provide the services upon which its customers rely would be in question. More significantly, because exclusivity is not included as part of the two-year wind down provision, if the closing were allowed to take place, Alere would be in a

position to begin immediately to make licensing decisions with Roche's competitors. None of these harms can be adequately compensated for or ameliorated by a monetary payment from MAS to Roche. For these reasons, we find that Roche has demonstrated that, if the Court were to permit the closing of the MAS/Alere deal to occur without certain protections for Roche, significant irreparable harm to Roche for which there is no adequate remedy at law is threatened.

### C.     Balance of Harms

As discussed above, Roche has presented convincing evidence that it will likely suffer harm in the marketplace and in connection with its customer relationships if injunctive relief does not issue. Although, as we have noted, the extent of that harm is tempered by the protections afforded Roche by the two-year wind-down period as set forth in the Co-Marketing Agreement, without the injunctive relief it seeks Roche nevertheless still faces a likelihood of irreparable harm stemming from the loss of its exclusive rights to MAS's RALS software and the potential effect Alere's business decisions could have on Roche's place in the market as well as disruptions in customer goodwill.

MAS, on the other hand, argues that if a preliminary injunction issues, its shareholders will be deprived of their right to sell their shares at a fair price to a company of their choosing and that any (further) delay could compromise or threaten the retirements and other financial interests of MAS's employees. At the preliminary injunction hearing, MAS presented new evidence regarding the impact that Roche's

difficulties in securing FDA-approval for its "next generation" Inform II glucose meter will likely have on MAS's business in the near future, if the preliminary injunction issues and MAS is required to continue to provide Roche exclusive access to the RALS software for blood glucose point-of-care devices.

Although Roche's failure to get the Inform II to market has, as of yet, had little to no effect on MAS's current customers, the evidence adduced at the hearing established that this lack of impact may be short-lived in that it is due in large part to the fact that those customers were already locked into multi-year agreements with MAS in most cases for terms of three to five years. Officers of MAS also testified that the uncertainty in the marketplace regarding Roche's ability to launch the Inform II in a timely manner has led new customers and those current customers whose multi-year deals are expiring to commit to shorter contract terms of as little as six months to a year. These shorter terms have already affected and will continue to affect adversely MAS's ability to predict its revenue out into the future, which in turn affects MAS's ability to commit resources to the development of its products.

In addition, Mr. Wassenaar, MAS's CEO, testified regarding the negative impact the continued inability to complete the deal with Alere has had and will continue to have on MAS's business. Obviously, MAS deals in technology, for which there is an active competitive market, one in which time is of the essence as customers are always clamoring for the newest products and services. As long as the company remains in limbo regarding its structure and ownership, MAS is unable to provide either its

employees or its customers certainty regarding the future of the company and its plans with regard to product development. Mr. Wassenaar testified that, because neither he nor his management team knows what to say regarding the status of the closing or the company's vision for the future, MAS's customers have expressed concern and confusion about the situation, which he believes will have a "catastrophic" effect on MAS's business certainly by the end of the year, if the situation is not resolved. In short, convincing evidence adduced at the hearing establishes that, if a preliminary injunction issues and the continued uncertainty regarding the status of the Alere/MAS closing continues until the arbitration proceeding runs its course, MAS will likely face significant and imminent harm.

Having had the opportunity to review the more fully developed factual record on the issue of balance of harms based on the evidence adduced at the preliminary injunction hearing, we find that the harm likely to be suffered by MAS and its shareholders if an injunction issues to stay the closing of the MAS/Alere merger outweighs that which would likely befall Roche if the injunction were denied. Although each party has established that it will likely suffer some harm if the Court rules in favor of the other side, we find that the contractual two-year wind-down period following the non-renewal of the Co-Marketing Agreement lessens the severity of harm that Roche would face in the absence of injunctive relief and that the protection the wind-down period affords Roche is sufficient to shift the balance of harms factor in favor of MAS. There is no indication that either MAS or Alere (as MAS's successor in interest, assuming the closing proceeds)

intends not to honor the continuing obligations MAS owes to Roche under their contractual agreements, particularly during the wind-down period, and our ruling here is intended to assure that result. We acknowledge that Roche is not contractually entitled to enjoy continued rights to exclusivity throughout that two-year period, but MAS is contractually obligated to continue to provide the RALS products and services to Roche and its customers in the same manner as it did while the Co-Marketing Agreement was in full force. However, because the wind-down period does not eliminate entirely the threat of irreparable harm to Roche, we shall attempt to ameliorate any further harm to Roche by ordering MAS/Alere to continue to provide Roche exclusive rights to the RALS Glucose Module as set forth in Section 2.1 of the Co-Marketing Agreement until a final decision in the arbitration proceeding.

### D. Public Interest

This factor between the parties is largely a wash. Clearly, the public has a significant interest in the enforcement of contracts and arbitration agreements. Although it is true, as Defendants argue, that there is a countervailing interest in an open and competitive marketplace, because we have found that Roche has established at least some reasonable likelihood of success on the merits, the issuance of a preliminary injunction in this situation would not in our judgment offend the public interest.

### III. Conclusion

As noted above, the situation presented here is unusual in that the merits of the right of first refusal claim are not before this Court for a decision, even in the form of a

29

preliminary finger-in-the-wind injunctive ruling. Because Roche has sought a preliminary injunction in aid of arbitration, we have limited our analysis regarding Roche's likelihood of success on the merits to a determination of whether it has established the existence of a meritorious issue for an arbitrator to decide. Mindful that there is still a significant amount of discovery yet to be undertaken in this case before a final decision can be made, we find that, at this early stage of the proceedings, Roche has presented sufficient evidence to satisfy its burden of showing a likelihood of success on the merits and further that it is likely to experience to some degree irreparable harm if the closing of the proposed MAS/Alere deal goes forward so that it loses its exclusivity rights to the RALS software. However, the likely irreparable harm that MAS and its shareholders will suffer if the Court enjoins the closing of its merger with Alere is also clear and of greater severity than that potentially faced by Roche, given the contractual protections afforded Roche under the Co-Marketing Agreement. As noted above, the public interest factor in this case is largely a wash.

In the Court's view, equity would not be served by imposing further delay in the closing of the MAS/Alere proposed merger, but that certain parameters must be placed on MAS/Alere's operations until a final arbitration decision is handed down.

It is therefore ORDERED, ADJUDGED, and DECREED that:

1.  Plaintiff Roche's request that Defendant MAS be enjoined from proceeding to finalize its merger with Alere (Extemplo) by completing the closing of that transaction is <u>DENIED</u>, and the closing between MAS and Alere therefore may proceed.

2.    Defendant MAS and its successor interests and their agents, servants, employees, attorneys, and all others in active concert or participation with them, are hereby preliminarily <u>ENJOINED</u> from any failure on their part, or on the part of any related party, to give full force and effect to the rights and obligations detailed in Section 6.3 of the Co-Marketing Agreement throughout the two-year wind-down period referenced therein, or until entry of a final decision in the arbitration proceedings.

3.    Defendant MAS and its successor interests and their agents, servants, employees, attorneys, and all others in active concert or participation with them are <u>ORDERED</u> to provide Roche exclusive rights to the RALS Glucose Module as set forth in Section 2.1 of the Co-Marketing Agreement until entry of a final decision in the arbitration proceedings and in no event more than two (2) years.

4.    Plaintiff Roche is <u>ORDERED</u> to commence the arbitration proceedings at the earliest possible time, and in no event later than thirty (30) days following a final decision on this request for preliminary injunction, and further, both parties are admonished to take all appropriate steps to secure a final decision in that arbitration forum at the earliest reasonable date.

5.    Acknowledging the prior agreement reached by the parties in their Co-Marketing Agreement, no bond shall be set or otherwise required of either party based on the rulings made here.

6.    The parties are hereby <u>ORDERED</u> to inform their agents, servants, employees, and all others in active concert or participation with them of the issuance of this preliminary injunction to ensure their compliance with this Order. Steps to inform shall be undertaken immediately and shall include distribution of a written notice and a copy of this order as well as a prominent posting of the order in a place readily reviewable by said employees and agents.

This ruling is hereby <u>STAYED</u> until 5:00 p.m. (in Indianapolis, Indiana) on

Friday, February 25, 2011, in order to allow either side to take an appeal to the Seventh

Circuit.

IT IS SO ORDERED.

Date: _____02/23/2011_____

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Daniel K. Burke
HOOVER HULL LLP
dburke@hooverhull.com

Tiffany A Buxton
ALSTON & BIRD
tiffany.buxton@alston.com

John F Cambria
ALSTON & BIRD LLP.
john.cambria@alston.com

Mark Jason Crandley
BARNES & THORNBURG LLP
mcrandley@btlaw.com

Andrew W. Hull
HOOVER HULL LLP
awhull@hooverhull.com

Casey Cole Kannenberg
BINGHAM MCHALE LLP
ckannenberg@binghammchale.com

Scott E. Murray
BARNES & THORNBURG LLP
smurray@btlaw.com

Michael  Rosiello
BARNES & THORNBURG LLP
mike.rosiello@btlaw.com

Andrew P Sherrod
HIRSCHLER FLEISCHER, P.C.
asherrod@hf-law.com

Wayne C Turner
BINGHAM MCHALE LLP
wturner@binghammchale.com

T. Joseph Wendt
BARNES & THORNBURG LLP
jwendt@btlaw.com

Charles F Witthoefft
HIRSCHLER FLEISCHER, P.C.
rwitthoefft@hf-law.com